J(tdge Nicholas,
dissenting from the decision of the other members of the court, delivered the following Opinion.
The principal question presented is, whether a note negotiable and payable at the Bank of Kentucky, and discounted by the bank, stands, as to priority over other *122 debts in the settlement of a decedent’s estate, upon the same grade with judgments.
This depends upon the proper construction of the following words of the thirteenth section of the charter of the 1 Dig 144 :-
« And all notes or bills discounted by said corporation, shall be, and they are hereby, placed upon the same footing as foreign bills of exchange, so that the Jibe remedy may be had for the recovery thereof against the drawer or drawers, endorser or endorsers, and with the like effect, (except so far as relates to damages,) any law, custom or usage to the contrary notwithstanding.”
The first section of the act of 1798, 1 Dig. 192, declares,, that foreign bills of exchange shall, after protest, bear interest at the rate of ten per centum per annum„
The second section gives the action of debt on a foreign bill of exchange, for principal, interest and charges of protest, against the drawers and endorsers jointly, or against either of them separately ; “ and judgment shall be given for such principal, charges' and interest, after the rate of ten per centum per annum, as aforesaid, to the time of such judgment, and legal interest upon the money recovered, until the same shall be satisfiedi”
The third section says, that a protested foreign bill of exchange, after the death of a drawer or endorser, shall be of equal dignity with a judgment, and directs executors and administrators to permit judgments against them thereon, “ before any bond, bill, or other debt of equal or inferior dignity, Under the penalty of being liable to pay the same out of their own proper goods.”
If the charter of the bank had stopped after saying the notes discounted by it, should be placed “ upon the same footing as foreign bills of exchange,” it would have been free from ambiguity, and there would have been' no room left for any construction which would take from a discounted note, the dignity of a foreign bill, in the administration of a decedent’s estate. But it is contended, that the succeeding words, “ so that the like remedy may be had for the recovery thereof, against the drawers or endorsers, and with the like effect, (ex *123 cept so far.as relates to damages,)” do restrain the import of the preceding words, to the giving the remedy by action of debt allowed by the act of 1798, on foreign bills. This construction, which merely gives the remedy by action of debt, is obviously far short of the legislative intention, as it has always been understood and acted upon by the courts in numberless cases, recognising that the charter had imparted to a discounted note, the actual qualities of a hill of exchange, and, as an incident thereto, requiring protest and notice of nonpayment, to fix the liability of an endorser, instead of the legal diligence, by suit, required in the case of ordinary promissory notes. This recognised quality or property of a discounted note could never have arisen from the giving of merely the same remedy by action of debt, allowed in favor of a foreign bill. The remedy so given neither imparted or took from a foreign bill.that or any other quality. Notice of protest is still necessary' to a recovery on a foreign bill, notwithstanding that remedy is pursued ; and as it is equally required in a recovery on a discounted note, the latter must have received from the charter some of the properties of a hill of exchange, over and above what the remedy merely could have imparted. As, then, the section must be so construed as to give a discounted note some of the qualities of a foreign bill, independent of the mere remedy, and as that effect is only given by the broad, comprehensive language placing them upon the same footing, it would seem necessarily to follow, that they must be tr.eated as standing upon the same footing for every purpose, except so far as those who contend for a different . construction, can restrain the assimilating process of the charter, by fair interpretation of some other restrictive • words or expressions. The words, “ and with the like effect (except so far as' relates to damages,)” cannot be tortured into any such purpose. On the contrary, to give any operation to the words “ with the like effect,” they must be made to refer to the placing a note on the footing of a bill of exchange, and not to the remedy spoken of. To use the words, “ except so far as relates to damages,” for any such purposes, would violate the *124 fundamental rules of all construction, which treat the exception of one thing as the implied inclusion of all other things not excepted, on the same principle .that the enumeration of particulars is the exclusion of generais, and the mention of one thing is the exclusion of another.
Considering the large share which the state held in the stock of the bank — that is one half as originally contemplated by the charter — and the earnest desire which may well be presumed on the part of the legislature, to ensure the success of the first experiment of such an institution in our state, very adequate motives may well be inferred for the giving such dignity and priority to a discounted note ; and at the same time, a satisfactory reason is found for assimilating a discounted note to a foreign, rather than an inland, bill of exchange. On the other hand, the opposite construction, which restricts it of this effect, infers the absence of that heedful caution and monopolizing selfishness, which characterizes all legislation where the state involves its interests with those of individuals, and which our legislature can at no time be charged with having laid aside, but of which it subsequently shewed itself especially mindful, on the kindred subject of the Commonwealth’s Bank.
The use of the superfluous language as to the remedy, is fairly ascribableto that superabundant caution, which frequently manifests itself in our legislative enactments, and is equally displayed, and in almost the identical same manner, in the act of 1812, placing unsealed, on the same footing with sealed writings.
As it was no part of the effect of the second section of the act'of 1798, either to make that a bill of exchange which otherwise would not have been, or to give damages upon any bill which otherwise, without that section, would not bear them, the exception, stated in the charter, as to the effect of discounting a note, that damages should not be allowed thereon, as was allowed upon a foreign bill, conclusively shews the legislative understanding of the true import of the language used ; and that, but for that exception, a discounted note would for every purpose be placed upon the same foot *125 ing as a foreign bill. It is equally, manifest, from the fact of making such an exception, that the intention was, that a discounted note should, for every other purpose, stand, in all respects, upon the precise same footing as a foreign bill.
The idea of converting a promissory note into a bill of exchange, was no doubt taken from the statute of Anne, indeed, from some of the phraseology of the thirteenth section of the charter,' it is apparent, that the draftsman of the charter had that statute before him. The statute of Anne places assigned notes on the footing of inland, not of foreign bills. The distinction is an essential one in many respects. Prima facie, our legislature would also have preferred to place the notes discounted by the bank upon the footing of inland, rather than of foreign bills, in the absence of any controlling reason to the contrary. That reason, then, must be sought for. None has suggested itself, and it is believed that none, having even the semblance of plausibility, can be suggested, except that, according to the existing law, foreign bills had the dignity of judgments in the settlement- of a decedent’s estate ; whereas, inland bills had no such dignity and priority. When it is recollected, that, according to the scheme of the charter, it was contemplated that the state was to own' one half of the stock, an abundant reason is'also found, why the foreign bill should have been selected, on that very account.
A loose note of an opinion by our predecessors, endorsed on the back of the record, in the case of the Bank versus Sturgus’ Administrators, is relied upon, as establishing a different construction. It is difficult to ascertain from'the language there used, whether it was thought, that the case necessarily turned upon the point now under consideration. But be that as it may, I cannot receive that case as a controlling authority, in opposition to the construction which, to my mind, is so indisputably the only legitimate one. The only reason assigned in that casd, why the discounted note does not acquire the dignity of a judgment, is because the third section of the act of 1798 only gives that dignity to protested foreign bills of exchange, and the charter does *126 110t place the note on the footing of a protested foreign bill of exchange. I understand the word protest, as used in She act of 1798, to import nothing more than dishonored. Why should not the same remedy and the same damages be allo'we'd on foreign bills, where no protest was necessary to a recovery, as where it was ? There is no good reason for any such distinction ; and the legislature should not be presumed to have intended any such. But concede, that the true construction is otherwise, and that the distinction was intended. That will-not affect this question. If the charter placed discounted notes on the footing of foreign bills, except as to damages, — as-one of the incidents of a foreign bill was, that, when protested, it held the-dignity of a judgment, — so also it would seem necessarily to follow, that when the discounted note, having all the essential qualities of a foreign bill, was protested, that it, also, would then be raised to the same dignity. But this opinion, thus intimated in the Bank versus Sturgus, is in direct contravention of the uniform construction of the charter by both bar and bench, ever since its passage, and as has been recognised by our predecessors in numerous cases. The uniform habit, under the sanction of this court, has been to sue upon a discounted note, as a protested foreign bill, under the remedy given by the second section of the act of 1798, in debt, against all the parties, or either of them separately. Now, it is only upon protested foreign bills that this remedy is given by the act of 1798, and it can, with the same pro* priety, be contended that the charter does not apply to the second section, giving the remedy on a protested bill, as to the third section, which gives the accumulated dignity. There is no room or reason for distinction or difference between them. The charter does not give the remedy allowed on protested bills. The only way you obtain the remedy afforded by the act, is by shewing that the note is, by the charter, placed on the footing of a foreign bill ; and then, because that remedy is allowed as incident to a foreign bill, to allow it, also, as incident to the note thus converted into a foreign bill. *127 The very same process of reasoning inevitably places it upon the same scale of dignity when protested. The case of the Bank versus Sturgus, standing, as it does, in such direct repugnance to a construction so long, and. so well established, and so repeatedly recognised by the same judges, could weigh little, even if it had been discussed seriatim; but circumstanced as it is, it should weigh nothing at all as an authority.